Filed 4/20/16  P. v. Coronado CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIGUEL CORONADO,<br><br>    Defendant and Appellant. | D069429<br><br><br><br>(Super. Ct. No. RIF1303191) |

APPEAL from a judgment of the Superior Court of Riverside, Charles J. Koosed, Judge.  Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant guilty of three felony counts of aggravated sexual assault by oral copulation with a child under 14 years of age (Pen. Code, §§ 269, subd. (a)(4),

288a),[1] and four felony counts of committing a lewd or lascivious act with a child under 14 years of age (§ 288, subd. (b)(1)). The trial court sentenced defendant to 73 years in prison. On appeal, defendant contends there was insufficient evidence to support the finding that he used force or duress to accomplish the offenses. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Overview*

Defendant is victim Doe's father. Doe's mother left the family when Doe was one year old, and the father gained sole custody of Doe and three of her brothers. Defendant and the children then lived in several locations—first with Doe's paternal aunt's family, then alone in an apartment, then in the garage of a friend's house, and then alone in another apartment. Each time the children lived alone with defendant, he molested Doe. She was six years old when the sexual abuse began at the first apartment, and nine or 10 years old when it began at the second apartment. The abuse finally ended when Doe reported it at age 11.

### *The Molestations*

Doe was born in 2001. Sometime before Doe was school-age, defendant and his children moved from Mexico to Riverside. They first lived in a house with the paternal aunt, uncle, and cousins. Doe occasionally saw her mother. Defendant never molested Doe while they lived at this location.

---

[1]     All further statutory references are to the Penal Code.

2

When Doe was six years old, defendant and his children moved into a two-bedroom apartment across the street from the aunt's house. Doe's brothers shared one bedroom, Doe had the other bedroom, and defendant slept on a living room couch. One day when defendant and Doe were home alone, defendant asked Doe to get on top of him while he was lying on the couch in his boxers. Doe complied and lay face-to-face on top of her father. Doe felt her father's "privates," which felt "[h]ard," against her body. After two or three minutes, Doe got up and went outside. The incident bothered Doe, but she said nothing to defendant or anyone else. Doe tried to forget that this happened because she would not believe that her own father would do this to her.

On another occasion, Doe and defendant were alone in her bedroom when defendant told her to lie on him again. As Doe was lying on top of defendant, he grabbed her by the waist and moved her side to side for a couple of minutes. Doe felt defendant's penis through his boxers. The incident stopped when Doe walked away. Doe felt that lying on her father was wrong because she "felt his presence."

When Doe was eight or nine years old, defendant moved the four children from Riverside to the garage of a friend's home in Rialto. They lived here for about one and one-half years. Doe's brothers and father slept in the garage, while Doe slept in a bedroom inside the house. Once while living here, defendant hit Doe with a belt or pulled her hair to punish her for throwing a ball through a window. Defendant never molested Doe while they lived at this location.

When Doe was about nine or 10 years old, she moved with defendant and her three brothers to a two-bedroom apartment in Rubidoux, California. Doe and her father

3

shared one bedroom, and her three brothers shared the other. Doe and defendant initially shared a single bed, until a second one was added sometime later.

While living at the second apartment, Doe saw her mother more often. This angered defendant, and he yelled at the children when the mother visited.

As the only parent in the household, defendant was Doe's sole disciplinarian. He yelled at Doe daily, which was more frequently than he yelled at his sons. When defendant got angry, he would hit Doe or pull her hair. One time, defendant hit Doe with a belt for dropping a bottle of hot sauce. Defendant bought beer "all the time." When he was mad or sad, he would drink around "two forties" (40-ounce bottles of beer) and then take his anger out on the children. One time when defendant was drunk, he got mad at Doe for no apparent reason and stood on her with both feet while she lay on the floor. Doe sustained bruises to her stomach. Doe feared her father when he was mad and physically abusive.

The first molestation in the second apartment occurred within days of moving in. After returning from Doe's aunt's house one night, Doe could tell defendant was drunk because she smelled alcohol on his breath and he talked "[s]exual" to her. Doe did not want to sleep on the single mattress in the bedroom she shared with defendant and instead wanted to sleep in the living room. However, defendant commanded that she sleep in the bedroom with him, warning, "I don't want you to get raped by your own brother." Doe complied. When she went into the bedroom, defendant locked the door and started giving Doe "longer" kisses on the mouth. Doe told him to stop, but defendant continued. Doe left the room when defendant finished kissing her.

4

On another occasion, defendant made Doe orally copulate him in their bedroom when her brothers were not home. Defendant pushed Doe towards him with his hands, took his penis out of his boxers, put her mouth on his penis, and instructed Doe to suck on it. Defendant then masturbated while Doe's mouth was on his penis. "[W]hite liquid" went into Doe's mouth, and she ran to the bathroom to spit it out. Doe did not tell anyone about this incident because she was scared that her brothers and mom were going to get her in trouble.

On a different occasion that occurred when Doe was still nine years old, she and defendant were showering together while her brothers were in their bedroom with their door closed. Defendant started masturbating and then called Doe's name because he wanted her to grab his penis. After initially ignoring him, Doe told him "No" and got scared. Defendant asked her to masturbate him and Doe complied by "put[ting] it up and down."

Another time, when her brothers were not home, Doe was watching television on defendant's bed when he told her to unbutton her pants. Doe did it because he told her to do so. Doe was lying on her back and defendant got on top of her. Defendant then grabbed her with his fingers in "the thing where you pee," which made Doe feel "weird." The touching stopped when she left to go to the living room.

One Christmas Eve, defendant gave "long" kisses to Doe for about one minute while in their bedroom. Her brothers were home at the time, but they were in the other room getting ready to visit their mother.

5

On a different day, defendant called Doe into the bedroom and told her to suck on his penis. Defendant made Doe hold his penis while she orally copulated him.

Another day when Doe and defendant were alone in their bedroom, defendant told Doe to grab his penis. She grabbed it for a few minutes and defendant ejaculated. Doe left the room when defendant got up to wash semen from his hands and boxers.

On a different occasion, Doe was showering when she heard someone come into the bathroom. She asked who it was, but received no reply. Doe pulled back the shower curtain to see who had entered and saw defendant. He then opened the curtain, reached into the shower, and touched Doe's vagina with his fingers for two minutes. After defendant walked away, Doe continued to shower because she felt "nasty" and "ugly."

On a later occasion when they were home alone, defendant touched Doe's breast. Defendant called her into the bedroom; when she sat on the bed, defendant reached under her tank top and grabbed her breast. He told Doe to do a dance for him, but she refused and walked away.

Once, when Doe was lying on top of defendant in his bed, defendant asked Doe if she wanted to have babies with him. Doe told him no.

The final time defendant touched Doe occurred in 2013 (when she was 11 years old), the weekend before Doe disclosed to her brother that defendant had molested her. For the two months preceding Doe's disclosure, she had been sleeping in the living room because she no longer wanted to sleep in the same bedroom as her father.

During this final touching incident, defendant was drunk and told Doe to lie on her back on his bed. When he started grabbing her, she asked him to stop. Defendant replied

6

by telling Doe to pull her pajama pants down. When Doe refused, defendant pulled down Doe's pajamas and underwear and started licking her vagina. This made Doe feel "[n]asty," and the licking stopped when she got up, hit him, and walked away to the bathroom. Defendant never told Doe not to tell anyone about the abuse after this or any of the other incidents.

*The Investigation*

Tired of the touching and feeling "disgusting," Doe confided in one of her brothers. She wrote him a note that said "My dad touched my private parts." After Doe handed her brother the note, she started crying, went to the bathroom, and did not want to talk about it. The brother told their mother, who called the police the next day.

Soon after, Sergeant Samuel Flores of the Riverside County Sheriff's Department conducted a recorded interview with defendant at the sheriff's station. Defendant initially denied ever molesting Doe, claiming he was unable to achieve an erection due to his diabetic condition. Later in the interview, defendant claimed Doe "threw herself" at him and wanted to grab his penis. He said he tried to discourage Doe by telling her she needed to "calm down" because he was her father. Defendant also told Flores that Doe learned how to do sexual things from her older friends. However, when Flores asked defendant if Doe was telling the truth about the sexual abuse, defendant admitted she was.

Defendant then confessed to the incident where he licked Doe's vagina, explaining he was drunk at the time. He claimed Doe allowed him to do it and that it started when she kissed him first. He also admitted that when Doe was around nine years old, he put

7

his penis in her mouth at least once and had her masturbate him until he ejaculated. Defendant also told Flores that he touched Doe's vagina, but claimed it was only to feel her newly growing pubic hairs. He further acknowledged touching Doe's chest, but claimed it was an accident.

Defendant said he would ask Doe for her forgiveness if she was in the interview room. Flores gave defendant 15 minutes to write Doe a letter. In his letter, defendant asked for Doe's forgiveness, told her to "remember well who started with those things," and reminded her that he warned her that "those things are not done with a dad." He also admitted that he was drunk when he licked her vagina and told her that he needed help. After reading his letter aloud, defendant told Flores that he needed help and admitted that he knew his conduct was a crime.

*Trial, Verdict, and Sentencing*

The People charged defendant with three felony counts of aggravated sexual assault by oral copulation with a child under 14 years old by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§§ 269, subd. (a)(4), 288a, subd. (c)(2)(B); counts 1 through 3), and four felony counts of committing a lewd or lascivious act with a child under 14 years old by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 288, subd. (b)(1); counts 4 through 7).

During closing argument, the prosecutor explained to the jury that count 1 corresponded to defendant orally copulating Doe, and counts 2 and 3 corresponded to the

8

two times she orally copulated him. The prosecutor argued defendant used force to accomplish count 1, and duress to accomplish counts 2 and 3.[2]

The prosecutor explained counts 4 through 7 could arise from any of the following conduct: when Doe masturbated defendant in the shower and in the bedroom; when defendant had Doe lie on top of him as he rubbed her body on his penis; when defendant grabbed Doe's vagina in the shower and on the bed; when defendant groped Doe's chest; or when defendant kissed Doe on the mouth on multiple occasions.[3] The prosecutor argued that defendant used duress to accomplish all of these acts.

The defense theory was that Doe was lying about the abuse and that the allegations were orchestrated by Doe's mother because she wanted custody of the children. Defendant testified and denied he ever touched Doe. He stated that his diabetes prevented him from being able to achieve an erection or ejaculate. Defendant claimed he confessed to Sergeant Flores because Flores manipulated and intimated him.

The jury convicted defendant on all seven counts. The trial court sentenced him to 73 years in prison.

---

[2] The trial court instructed the jury on both theories as to all counts.

[3] The trial court instructed the jurors they must unanimously agree which conduct constituted an offense.

DISCUSSION

Defendant contends insufficient evidence supports the finding that he committed the molestations with the required force or duress. (See §§ 269, subd. (a)(4); 288a, subd. (c)(2)(B); 288, subd. (b)(1).) We disagree.

In reviewing a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Horning* (2004) 34 Cal.4th 871, 901.) Because this court has a limited role on appeal, defendant bears an enormous burden in asserting there is insufficient evidence to sustain his molestation conviction. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*).) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, brackets in original.)

Convictions for oral copulation under section 269, subdivision (a)(4) and lewd or lascivious acts under section 288, subdivision (b)(1) require proof of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§§ 269, subd. (a)(4), 288a, subd. (c)(2)(B), 288, subd. (b)(1).) Courts have defined duress as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an

10

act to which one otherwise would not have submitted." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50 (*Pitmon*).)

"The very nature of duress is psychological coercion." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15 (*Cochran*).) In appraising the existence of duress, the " 'total circumstances' " should be considered, including the following: the relative ages and sizes of the defendant and victim; the relationship between the defendant and victim; whether the defendant threatened the victim with harm; whether the defendant exercised physical control over the victim; whether the crime occurred in an isolated area; and whether other facts indicate the defendant exercised psychological dominance over the victim. (*Id.* at pp. 13-14; *People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 238-239.)

" 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*People v. Schulz, supra*, 2 Cal.App.4th at p. 1005.) Indeed, when a young victim "is molested by her father in the family home, in all but the rarest cases duress will be present." (*Cochran, supra*, 103 Cal.App.4th at p. 16, fn. 6.) "The fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant." (*Id.* at p. 14.)

Several courts have upheld findings of duress despite the lack of force, violence, or express threats when, as here, the victim was a young, small child and the defendant

11

was an authority figure. (See *Veale*, *supra*, 160 Cal.App.4th 40; *Pitmon, supra*, 170 Cal.App.3d 38; *Cochran, supra*, 103 Cal.App.4th 8.) *Veale* is particularly instructive. There, the defendant molested his seven-year-old stepdaughter in the family home and locked the door on at least one occasion. (*Veale, supra*, 160 Cal.App.4th at p. 47.) Although the defendant did not use violence, physical force, or explicit threats, the court held that the evidence supported a reasonable inference that the defendant made an implied threat based on the victim's young age; the disparity between the defendant and victim's age and size; the defendant's position of authority in the family; and the victim's fear of the defendant and belief that he would kill her or her mother if she disclosed the molestation to anyone, despite the fact the defendant never threatened to do so. (*Veale, supra*, at pp. 45-47.)

In *Pitmon*, an adult male stranger molested an eight-year-old boy in a schoolyard. (*Pitmon, supra*, 170 Cal.App.3d at p. 44.) The victim's youth, his small size compared to the defendant's, the isolated location where the molestation occurred, and the defendant's acts of physical control (such as grabbing the victim's hand and making him rub the defendant's penis) constituted an implied threat sufficient to support a finding of duress. (*Id.* at p. 51.) The court noted the victim was at "an age at which adults are commonly viewed as authority figures" and the "disparity in physical size between an eight-year-old and an adult" created "physical vulnerability." (*Ibid.*)

In *Cochran*, the defendant videotaped himself molesting his nine-year-old daughter in their family home. (*Cochran, supra*, 103 Cal.App.4th at p. 15.) Despite the victim's testimony that she was not afraid of the defendant and that he did not beat,

12

punish, grab, or force her, our court found substantial evidence supported the finding of duress. (*Id.* at pp. 15-16.) We relied in part on the fact that the victim was only nine years old; the defendant was her father, with whom she lived; and there was a considerable size difference between them. (*Id.* at p. 15.) We noted the victim's behavior on the videotape in which the defendant "directs and coaches the victim what to do" and the victim "engages in the conduct only because she is directed to do so." (*Ibid.*) We also noted the defendant told the victim not to tell anyone about the abuse because he would get in trouble and would go to jail. (*Id.* at p. 12.) We concluded that the victim was a "small, vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority," and "[h]er compliance was derived from intimidation and the psychological control he exercised over her and was not the result of freely given consent." (*Id.* at pp. 15-16.)

Reviewing the entire record, we find substantial evidence supports the finding that defendant accomplished the charged offenses by means of duress. When defendant began molesting Doe, he was approximately 39 years old and she was only six years old. Most of the sexual abuse occurred when Doe was between the ages of nine and 11, when she was susceptible to physical pressure and psychological coercion. (See *Veale, supra*, 160 Cal.App.4th at p. 43 [six- or seven-year-old victim]; *Pitmon, supra*, 170 Cal.App.3d 38 [eight-year-old victim]; *Cochran, supra*, 103 Cal.App.4th 8 [nine-year-old victim]; *Schulz, supra*, 2 Cal.App.4th 999 [nine-year-old victim].)

The disparity in physical size between Doe and defendant created physical vulnerability. Defendant is 5'10" and weighs 152 pounds. Although the record does not

13

disclose Doe's precise size, defendant characterized her as "small" during his police interview. Defendant exerted this physical dominance over Doe in the incidents where he physically controlled her (for example, pushing Doe toward him, putting her mouth on his penis, and lying on top of her).[4]

It is also significant that defendant is Doe's biological father and was her sole caregiver—and disciplinarian—since gaining sole custody of her at age one. Defendant was verbally and physically abusive, particularly when he drank or the mother visited the children. Doe feared defendant when he was angry and physically abusive; said she submitted to the sexual abuse because defendant told her to or made her; testified she never cried out for help during the abuse because she was scared; and never disclosed the sexual abuse to anyone because she was afraid she would get in trouble.

Additionally, all of the incidents occurred in isolation in the family home with no other adults present. By contrast, defendant never molested Doe when they lived with the aunt and uncle or in the friend's garage.

Finally, Doe's reactions to her father's molestation indicate that her compliance was "derived from intimidation and the psychological control [defendant] exercised over her and was not the result of freely given consent." (*Cochran*, *supra*, 103 Cal.App.4th at pp. 15-16.) For example, Doe said she felt "[n]asty," "ugly," "weird," and "disgusting" when defendant molested her.

---

[4]    We consider this exertion of physical dominance only in the context of duress; we offer no opinion whether it constitutes "force."

Defendant argues *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*) and *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*) support his argument that insufficient evidence supports a finding of duress. In *Hecker*, the defendant was convicted of molesting his 12- or 13-year-old stepdaughter in their home when they were alone. (*Hecker*, at pp. 1240-1242.) Our court found there was insufficient evidence of duress where there was no evidence that the defendant expressly or implicitly threatened the victim; the victim admitted she was never consciously afraid defendant would harm her and testified that with the exception of defendant's pushing her head down during the act of oral copulation, he never used physical force; and although the victim stated she felt " 'pressured psychologically' " and was " 'subconsciously afraid,' " there was no evidence defendant was aware of and sought to take advantage of such fear. (*Id.* at p. 1250.) The *Hecker* court observed, " '[p]sychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' " (*Id.* at pp. 1250-1251.)

In *Espinoza*, the defendant was convicted of molesting his 12-year-old daughter, who had recently moved in with him and resided there for one month. (*Espinoza, supra,* 95 Cal.App.4th at pp. 1292-1294.) Relying heavily on *Hecker*, the *Espinoza* court found insufficient evidence of duress, reasoning there was no evidence of a " 'direct or implied threat' of any kind." (*Id.* at p. 1321.) The court explained: "While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be

15

circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Ibid.*)

*Hecker* and *Espinoza* are distinguishable for several reasons. First, both are based on this court's statement in *Hecker* that " '[p]sychological coercion,' " without more, is insufficient to establish duress. (*Hecker, supra*, 219 Cal.App.3d at p. 1250; *Espinoza, supra*, 95 Cal.App.4th at p. 1321.) However, our court in *Cochran* subsequently found this language "overly broad," clarifying that "[t]he very nature of duress is psychological coercion." (*Cochran, supra*, 103 Cal.App.4th at p. 15; see *Veale, supra*, 160 Cal.App.4th at p. 48 [distinguishing *Hecker* and *Espinoza* on the basis of *Cochran*].)

Second, at six years old, Doe was significantly younger than the 12-year-old victims in *Hecker* and *Espinoza* when the sexual abuse began. Doe's young age rendered her more susceptible to psychological coercion through fear and her father's position of authority. (See *Veale, supra*, 160 Cal.App.4th at p. 50 [six- or seven-year-old victim].) Even at age nine or 10, when the sexual abuse resumed at the second apartment after a hiatus while Doe's family was living in a friend's garage, Doe was sufficiently susceptible to duress. (See, e.g., *Pitmon, supra*, 170 Cal.App.3d 38 [eight-year-old victim]; *Cochran, supra*, 103 Cal.App.4th 8 [nine-year-old victim]; *Schulz, supra*, 2 Cal.App.4th 999 [nine-year-old victim].) Notably, the first sexual abuse at the second apartment involved additional elements of coercion: defendant's warning that her brothers might rape her if she did not sleep in his bed; his locking the bedroom door after Doe entered the room; and his continued kissing of Doe after she told him to stop.

16

Third, Doe, whose father had been her sole caregiver and disciplinarian since she was one year old, had a more established father-daughter relationship than the victims in *Hecker* (a stepdaughter whose mother also lived in the home) and *Espinoza* (biological father with whom the victim resided for only one month).

Fourth, Doe stated she feared her father, who had a history of physically disciplining and abusing her, whereas the *Hecker* victim was not consciously afraid of the defendant (*Hecker, supra*, 219 Cal.App.3d at p. 1250), and the *Espinoza* victim's fear was not based on anything other than the defendant's continued molestation of her (*Espinoza, supra*, 95 Cal.App.4th at p. 1321).

In sum, substantial evidence supports the finding that defendant accomplished the challenged sexual offenses by means of duress. Having found duress, we need not consider whether defendant also accomplished count 1 by force. (See, e.g., *Cochran, supra*, 103 Cal.App.4th at p. 16.)

## DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

MCDONALD, J.

IRION, J.

17